**M & W GEAR COMPANY, Appellant,**

v.

**COMMISSIONER OF INTERNAL REVENUE, Appellee.**

**No. 18723.**

United States Court of Appeals, Seventh Circuit.

July 20, 1971.

Robert E. Johnson, Jerry Williams, Indianapolis, Ind., for appellant; Krieg, DeVault, Alexander & Capehart, Indianapolis, Ind., of counsel.

Johnnie M. Walters, Asst. Atty. Gen., William M. Brown, Meyer Rothwacks, Ann E. Balanger, Attys., Tax Div., Dept. of Justice, Washington, D.C., for appellee.

Before SWYGERT, Chief Judge, KERNER, Circuit Judge, and GORDON, District Judge.[1]

MYRON L. GORDON, District Judge.

This is an appeal from a decision of the United States Tax Court which upheld a determination by the Commissioner of Internal Revenue that the appellant is liable for a deficiency of over $60,000 for the two taxable years ended June 30, 1964, and June 30, 1965. The opinion of the Tax Court is reported in 54 T.C. 385 (1970).

The appellant is a corporation which manufactures agricultural equipment at a factory in Gibson City, Illinois. In the early 1960's, the corporation began to make implements of a type which were to be pulled by a tractor. Because of its plan to test such equipment before offering it for sale, the appellant began to look for large expanses of land.

The company determined that farm land near Gibson City would be desirable; initial testing on leased land in Arizona had proved unsatisfactory because of cost and inconvenience. In the fall of 1962, Elmo Meiners, the appellant's president, learned that farm land was available near Wayne City, Illinois, about 200 miles south of Gibson City. Mr. Meiners communicated with Charles Nation, of Nation Realty and Insurance Co. of Fairfield, Illinois, who stated that Ben Nation, his brother, wished to sell his "Blairsville Farm."

Testimony before the Tax Court disclosed that the Blairsville Farm, which contains 1,490 acres, had been listed for sale with Nation Realty in late 1961 or early 1962 at an asking price of $335,250, or $225 per acre. The Tax Court found that Ben Nation and Mr. Meiners orally agreed to a sale of the farm for $358,000, and to a sale of certain farm equipment for $37,000. However, in January, 1963, the appellant drafted a "Lease Agreement for Agricultural & Experimental Work" and an "Option to Purchase." The lease provided for an annual rental of $34 per acre, or $50,660, for a five-year period, at the end of which the option to purchase could be exercised for $342,700 "less all monies received by the Sellers on [the] * * * lease." After the documents were examined by Ben Nation, the company had an attorney prepare the final draft of the document called "Lease" which forms the subject of the present action.

Under the instrument, as executed, the appellant became obligated to pay Ben Nation and his wife an annual sum of $50,660. While the appellant was allowed to make alterations and improvements, the Nations were under no obligation to make repairs. The lease also provided that the appellant was to procure fire insurance in an amount not less than 80% of the insurable value of the buildings and improvements on the property, with the policies to be made payable to "Lessors and/or Lessee and/or any Mortgagee and/or assignee designated by Lessors." Finally, the lease provided that, upon its execution, the appellant would purchase certain farm equipment for an additional $37,000.

An "option to purchase" was contained in paragraph 16 of the "lease" and stated, in part:

"Lessors hereby give the Lessee the right and option to purchase the leased premises and all buildings and improvements thereon including any alterations, buildings and improve-

---

1. The writer of this opinion is sitting by designation from the district court for the Eastern District of Wisconsin.

ments to the leased premises made by the Lessee pursuant to paragraph Seventh hereof at the termination of this lease or at the termination of any extension or renewal of this lease for the sum of One Hundred Seventy-Three Thousand Seven Hundred Seven Dollars and Forty Cents ($173,707.-40)."

In December, 1967, the appellant notified Ben Nation that it desired to exercise the option to purchase the Blairsville Farm. On February 7, 1968, Ben Nation and his wife executed a warranty deed to the farm to the appellant. The appellant then paid the Nations $1,267.94 which, as the Tax Court found, "represented the net amount payable after accounting for the assumption of [a] remaining outstanding mortgage indebtedness of $172,000 in addition to certain interest and taxes."

For the taxable years ended June 30, 1964, and June 30, 1965, the appellant deducted rental payments of $50,660 and $53,159.92, respectively. The appellee disallowed these deductions, stating that "Such payments did not constitute rental payments but partial payments on the purchase price of the land since by virtue of the payments you acquired, or will acquire, title to or an equity in, the property."

Two issues are presented for this court's determination. The first is whether the payments made by the appellant to the Nations under the purported lease were properly deducted as rental payments under § 162(a) (3) of the Internal Revenue Code of 1954 or were, instead, payments made to acquire an equity in the Blairsville Farm. The second issue concerns the propriety of the holding of the Tax Court that the appellant failed to prove that the Commissioner's determination of the useful lives of certain "leasehold" improvements was erroneous.

### I.

Section 162(a) (3) of the Internal Revenue Code of 1954 [26 U.S.C. § 162 (a) (3)] provides:

"(a) In general.—There shall be allowed as a deduction all the ordinary and necessary expenses paid or incurred during the taxable year in carrying on any trade or business, including—

"*    *    *.

"(3) rentals or other payments required to be made as a condition to the continued use or possession, for purposes of the trade or business, of property to which the taxpayer has not taken or is not taking title or in which he has no equity."

"Whether what is in form a lease is in effect a conditional sale contract depends on the intention of the parties." Benton v. Commissioner, 197 F.2d 745, 752 (5th Cir. 1952). See also Western Contracting Co. v. Commissioner, 271 F. 2d 694, 699 (8th Cir. 1959). In effect, this court must disregard the name attached by the parties to their agreement and instead look to what they "believe the legal effect of such a transaction to be." Oesterreich v. Commissioner, 226 F.2d 798, 801 (9th Cir. 1955). See also Frito-Lay, Inc. v. United States, 209 F.Supp. 886, 891 (N.D.Ga.1962).

In our opinion, the Tax Court's holding that the appellant intended to acquire an equity in the Blairsville Farm must be sustained. We are persuaded that the Tax Court had before it sufficient evidence from which it could conclude that the purported lease did not provide a means by which the appellant could obtain a rental deduction from its taxable income.

Because it contains a candidly clear expression of the appellant's intention to purchase the Blairsville Farm from the outset, we set forth here in full the contents of a memorandum sent from Wayne Powell, the appellant's vice-president and secretary, to Mr. Meiners in early 1964:

"Re: Farm Transaction

"Today I received an invoice from Ben covering the insurance on the

farm for 1963 amounting to $816.77. This amount of insurance is probably alright but we should investigate the amount of coverage and be named insured along with Ben.

"Included in the invoice was $2,051.00 for land taxes for the year 1962 but was paid in 1963 which we should not be obligated for.

"However, even though we are not obligated for the 1962 taxes but for the taxes hereafter Ben should not invoice us for these taxes because we made a $3,000.00 a year allowance for the insurance and taxes during the five year lease.

"The computation for the option to purchase amount was as follows:

| Payment dates | Lease payment | Taxes and insurance | 6-percent interest | Unpaid balance |
|---|---|---|---|---|
| Purchase price .............................. | | | | $342,700.00 |
| January 1963 .............. | $25,330 | ..... | ........ | 317,370.00 |
| June 1963 ................ | 25,330 | $3,000 | $9,521.10 | 304,461.10 |
| January 1964 .............. | 25,300 | ..... | 9,136.83 | 288,367.93 |
| June 1964 ................ | 25,330 | 3,000 | 8,651.04 | 274,688.97 |
| January 1965 .............. | 25,330 | ..... | 8,240.67 | 257,599.64 |
| June 1965 ................ | 25,330 | 3,000 | 7,727.98 | 242,997.62 |
| January 1966 .............. | 25,330 | ..... | 7,289.93 | 224,957.55 |
| June 1966 ................ | 25,330 | 3,000 | 6,748.73 | 209,376.28 |
| January 1967 .............. | 25,330 | ..... | 6,281.29 | 190,327.57 |
| June 1967 ................ | 25,330 | 3,000 | 5,709.83 | 173,707.40 |

"As you can see Ben has been paid for land taxes and insurance. The lease agreement stipulated that Ben would pay the land taxes and insurance. It was a verbal agreement that we reimburse Ben for these expenses thru the lease payment schedule.

"Charlie Nation has asked me for this breakdown several times. I didn't feel it was of any business to him *plus the fact we didn't want any type of document indicating it was our intention to purchase this farm from the beginning.* (Emphasis added)

"Now we are faced with the task of explaining the situation to Ben and I feel it should come from you in verbal form."

The "purchase price" of $342,700 set forth in the above memorandum is the same figure first used as an option price in the separate "option to purchase" originally prepared by the appellant. Not only does the Powell memorandum state that "it was our intention to purchase this farm from the beginning," but it provides a clue as to how the present option price of $173,707.40 was reached:

the "rental payments" were to be applied in reduction of the purchase price.

In addition, the option price of $173,707.40 is considerably less than the fair market value of the farm found by the Tax Court to be at least $342,700 and not more than $372,500 in 1963. While the appellant argues that the option price "represents a fair value for the real estate," we are not convinced that the Tax Court's findings are "clearly erroneous." See Commissioner of Internal Revenue v. Duberstein, 363 U.S. 278, 291, 80 S.Ct. 1190, 4 L.Ed.2d 1218 (1960); Frank v. Commissioner, 447 F.2d 552 (7th Cir. decided June 14, 1971); Allen Industries v. Commissioner, 414 F.2d 983, 986 (6th Cir. 1969).

The appellant urges that evidence of "comparable sales" militates against the Tax Court's findings as to fair market value; it points to sales of 200 and 290 acre parcels of land near the Blairsville Farm for prices ranging from $90 to $100 per acre. When the cost of improvements is considered, the appellant argues, the total investment in the com-

parable farm land is the same as the $116 per acre option price for the Blairsville Farm. Furthermore, the appellant contends, the option price was 73% of the total rent to be paid over the five-year life of the lease, and that such a "relationship is by no means unusual when there is a lease with an option to purchase."

■ It is true that the evidence of "comparable sales" lends weight to the appellant's argument that the option price is not so unreasonably low as to suggest that the "rental payments" were made with an eye to acquiring an equity in the farm. It is also true that the appellant was under no *legal* obligation to exercise its option. On the other hand, the Tax Court had before it evidence which suggests that the fair market value of the Blairsville Farm in 1963 was at least twice as much as the appellant's option price. This disparity, plus the fact that the agreement obligated the appellant to pay what appears to be a very high rental for farm property in the area, further supports the correctness of the Tax Court's findings. In this connection, we find the case of Breece Veneer & Panel Co. v. Commissioner, 232 F.2d 319 (7th Cir. 1956), cited by the appellant, to be distinguishable.

■ In addition, we are impressed with what appears to be the appellant's *economic* obligation to buy the Blairsville Farm. Not only did the appellant purchase $37,000 worth of farm machinery upon the execution of the lease, but it paid Ben Nation over $100,000 in 1963 and 1964 for ditching and draining of the farm property. Numerous other expenditures were made for "leasehold improvements" that included water tanks, sheds, culverts, floodgates, and water lifts. The latter are not recoverable expenditures to a lessee and, in our opinion, are inconsistent with a claim by the appellant that prior to the exercise of the option to purchase it had not intended to acquire an equity in the farm.

Finally, although it is certainly not determinative of the parties' intention, we note that Ben Nation and his wife treated the transaction as an installment sale of property on their federal income tax return for 1963.

As has been seen, the memorandum from Mr. Powell to Mr. Meiners stated that the appellant had agreed to reimburse Ben Nation for taxes and insurance on the farm; in addition, the memorandum makes it clear that part of the "rental payments" actually constituted interest on the unpaid balance of the purchase price. This evidence further tends to undercut the appellant's position; however, counsel for the appellant stated during the oral argument before this court that the appellee has not appeared willing to recognize the payment of the taxes, insurance, and interest as an appropriate deduction should the appellant's contentions be rejected. The appellant, of course, has not previously attempted to deduct such payments, for it has consistently maintained that the payments made to the Nations under the agreement were for "rent." However, in view of our conclusion that the appellant acquired an equity in the Blairsville Farm during the period of the "lease," we deem it appropriate that this action be remanded to the Tax Court for a determination of whether the sums expended on taxes, insurance, and interest may properly be deducted.

### II.

■ It has been noted that the appellant added what it called "leasehold improvements" to the Blairsville Farm prior to its exercise of the option to purchase. The Commissioner's ruling—now affirmed by this court—that the alleged lease was in substance a conditional sale of the property means that the appellant must depreciate the items over the term of their useful lives, rather than over the term of the lease. Twenty-seven such improvements were added by the appellant and are detailed in a schedule contained in the opinion of the Tax Court. However, the Tax Court rejected testimony of the appellant's farm manager and, instead, with one exception, adopted the Commissioner's finding that each of the items has a useful life of

twenty-years. It is our opinion that, in so doing, the Tax Court erred.

The Tax Court cites Rule 32 of the Tax Court Rules of Practice to the effect that, "The burden of proof shall be upon the petitioner." It then points out that, in fixing the useful lives of the improvements, the appellant relied solely upon the "uncorroborated testimony of one of petitioner's employees." However, this employee, Mr. Simpson, testified that he has been a farmer for all of his adult life and worked for Ben Nation at the Blairsville Farm prior to assuming the position of appellant's farm manager in 1963. We think that his opinion as to the useful lives of the improvements made by the appellant is entitled to considerable weight, especially when contrasted with the Commissioner's unsubstantiated assignment of useful lives of twenty years to each of the items.

We believe, as the appellant argues, that the farm manager's estimates are inherently credible and achieve the status of "reliable evidence." The Tax Court was not free to reject Mr. Simpson's testimony, particularly when it was not met with any evidence whatsoever on behalf of the Commissioner. The decision of the Tax Court in this regard must be reversed.

Affirmed in part, reversed in part, and remanded, with directions.